# EXHIBIT E

Exhibit: 1                              Volume 1, Pages 1-110

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

SIOBHAN WALSH,

    Plaintiff

v.                      Docket No. 1:13-cv-13064-RWZ

TELTECH SYSTEMS, INC.,

    Defendant

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF JOHNIENNE DiLORENZO

Wednesday, October 22, 2014, 1:07 p.m.

O'Connor, Carnathan and Mack LLC

Landmark One, 1 Van de Graaff Drive, Suite 104

Burlington, Massachusetts

- - - -Reporter:  Janis T. Young, RDR/CRR- - - -

jty@fabreporters.com     www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 350

Boston, Massachusetts 02109

617.728.4404

**Page 6**

```
 1   question.
 2      A. Okay.
 3      Q. Do you have any questions about the process
 4   before we begin?
 5      A. No.
 6         MR. CALANDRELLI: And we've agreed that
 7   all objections except to the form of the question
 8   will be reserved to the time of trial?
 9         MR. CARP: Yes.
10         MR. CALANDRELLI: 30 days to read and
11   sign?
12         MR. CARP: Yes.
13         MR. CALANDRELLI: Waive the notary?
14         MR. CARP: Yes.
15      Q. Mrs. DiLorenzo, I'm placing in front of you
16   what has been marked as Exhibit 1. Take a minute to
17   review that, if you will, please.
18         (Pause)
19      Q. Do you recognize this document?
20      A. I do.
21      Q. This is the subpoena that you received
22   requiring your attendance at today's deposition?
23      A. Yes.
24      Q. Do you see the category of documents that
```

**Page 7**

```
 1   were requested on the fourth page of this exhibit?
 2      A. Yes.
 3      Q. What did you do, if anything, to search for
 4   any of the documents that are requested in this
 5   list?
 6      A. Communicated the list to my attorney.
 7   I mean, I don't have any of this.
 8      Q. And by your attorney, you're referring to
 9   Attorney Carp?
10      A. Yes, I am.
11      Q. Did you actually do anything to determine
12   whether you had any of these documents?
13      A. No. I spoke to my attorney.
14      Q. For example, you didn't search any emails
15   to determine whether you had any communications that
16   were requested as part of this subpoena?
17      A. I know I don't have them in my possession.
18      Q. So you didn't actually search to see if you
19   had anything you'd forgotten about?
20      A. No.
21      Q. Did you go to high school?
22      A. Yes.
23      Q. Where?
24      A. Boston Latin Academy.
```

**Page 8**

```
 1      Q. What year did you graduate?
 2      A. 1995.
 3      Q. Did you attend any collegiate schooling?
 4      A. No.
 5      Q. What do you do for work?
 6      A. I am a veterinary assistant.
 7      Q. Where?
 8      A. At West Roxbury Animal Hospital in West
 9   Roxbury, Massachusetts.
10      Q. How long have you held that position for?
11      A. Four or five years.
12      Q. Did you work at the West Roxbury Animal
13   Hospital in 2009?
14      A. No.
15      Q. Where did you work in 2009?
16      A. Oh. Yeah, I got the job in 2009.
17      Q. Do you recall when in 2009?
18      A. No.
19      Q. What did you do for work before getting the
20   job at the animal hospital?
21      A. Before when?
22      Q. Before you got the job at the animal
23   hospital.
24      A. I did some waitressing, and before that I
```

**Page 9**

```
 1   was in real estate.
 2      Q. Where did you waitress?
 3      A. At a breakfast place in Quincy,
 4   Massachusetts.
 5      Q. What was the name of it?
 6      A. I forget the name.
 7      Q. When did you work at this breakfast place?
 8      A. In 2008, 2009. I can't quite remember.
 9      Q. Did John Luciano work at this restaurant?
10      A. Yes, he did.
11      Q. What was his position?
12      A. Chef.
13      Q. What was the address of the restaurant?
14      A. I don't know.
15      Q. Do you recall what street it was on?
16      A. No.
17      Q. How did you get the job?
18      A. Through John Luciano.
19      Q. Prior to working with him, did you know who
20   Mr. Luciano was?
21      A. Vaguely.
22      Q. Who was he, to your knowledge?
23      A. He grew up in Dedham.
24      Q. Was he friends with your husband?
```

Page 10

1  A. Not really friends; acquaintances.
2  Q. Did John Luciano attend your wedding?
3  A. I don't think so, no.
4  Q. Was he invited?
5  A. No.
6  Q. How well did you know John Luciano before
7  working with him at this breakfast place?
8  A. I'd say not at all, not really.
9  Q. Had you ever been to his apartment?
10 A. No.
11 Q. Do you know where he lived?
12 A. Before all of this happened?
13 Q. Sure.
14 A. No.
15 Q. You understand that you're here to testify
16 in connection with certain telephone calls that were
17 made to a woman by the name of Siobhan Walsh in
18 January and February of 2009; right?
19 A. I understand that.
20 Q. Using that time period as context, January
21 and February of 2009, had you already been working
22 at this breakfast place with John Luciano at that
23 time?
24 A. Yes.

Page 11

1  Q. Do you recall whether you first started
2  working at that place in 2008?
3  A. I'm sorry?
4  Q. Well, the first calls I'm going to ask you
5  about in a little while will have occurred on
6  January 28 of 2009; okay?
7  A. Okay.
8  Q. Using that date as a reference, do you
9  recall whether you first started working at this
10 breakfast place previously in the month of January
11 of 2009, or whether it was sometime before that?
12 A. It was sometime before that.
13 Q. So sometime in the year 2008?
14 A. Yes.
15 Q. By January 28 of 2009, were you still
16 working at this breakfast place?
17 A. I don't think so.
18 Q. What were the circumstances under which you
19 stopped working at this restaurant?
20 A. I quit.
21 Q. Why did you quit?
22 A. Because I didn't want to work there
23 anymore.
24 Q. Why didn't you want to work there anymore?

Page 12

1  A. It had become uncomfortable.
2  Q. Why?
3  A. Because of John Luciano.
4  Q. What was he doing to cause it to become
5  uncomfortable?
6  A. Being very inappropriate as a boss and a
7  coworker.
8  Q. In what ways was he being inappropriate?
9  A. Making advances that were unwanted.
10 Q. Did these occur during work?
11 A. Yes.
12 Q. Did they occur outside of work?
13 A. Yes.
14 Q. In what capacity outside of work?
15 A. He would call me.
16 Q. Would you speak with him?
17 A. Most of the time, no.
18 Q. Would he leave messages?
19 A. Yes.
20 Q. What did he say on his messages?
21 A. I don't recall a lot of what was said.
22 Q. What was the general nature of what he
23 would say on his messages?
24 A. The general nature? Advances, like I said.

Page 13

1  Q. Can you recall any more substance, other
2  than advances?
3      MR. CARP: Objection.
4  Q. Again, if your attorney objects, you can
5  still answer.
6  A. I mean, obviously they were sexual; just
7  things that made me very uncomfortable.
8  Q. Other than making advances, did Mr. Luciano
9  do anything else to cause you to quit working at the
10 restaurant?
11 A. Yes.
12 Q. What else did he do?
13 A. He was going by my house.
14 Q. What do you mean when you say going by your
15 house?
16 A. In the middle of the night, driving by my
17 house, getting out, looking in my windows.
18 Q. How did you find out about that?
19 A. I saw him. My neighbors saw it and brought
20 it to my attention. It made them question what was
21 going on.
22 Q. How many times would you say that you
23 personally saw Mr. Luciano drive by your apartment?
24 A. That I personally saw?

Johnienne DiLorenzo - Vol. 1 - 10/22/2014

9

**Page 30**

1 Q. Was it more than two years?
2 A. Yes.
3 Q. Was it more than five years?
4 A. I'm not sure.
5 Q. Why were you desperate to find a job at
6 that point?
7 A. Because I had been out of work for so long.
8 Q. Why had you been out of work?
9 A. Because I was sick.
10 Q. What were you sick from?
11 A. I had a brain tumor that was affecting my
12 health.
13 Q. How long had you been out of work for,
14 approximately?
15 A. I think a couple of years, maybe even more.
16 Q. Have you ever been arrested before?
17 A. No.
18 Q. Have you ever been charged criminally?
19 A. I don't think so.
20 Q. Do you know if Mr. Luciano had any type of
21 relationship with Ms. Walsh other than her being his
22 neighbor?
23         MR. CARP: Objection.
24 A. I don't know.

**Page 31**

1 Q. I'm placing in front of you what has been
2 previously marked as Exhibit 2 to Mr. DiLorenzo's
3 deposition. Take a minute to review that, if you
4 will, please. Your attorney already has a copy, so
5 that's for you.
6         (Pause)
7 Q. You can either read that whole thing or
8 just skim it; just let me know when you're ready to
9 answer some questions.
10         And I should add, Mrs. DiLorenzo, if I
11 ask a question and after I've asked the question it
12 would help you to review the document, just let me
13 know and you're free to do that; okay?
14 A. Okay.
15 Q. Have you ever before seen the document
16 that's been marked as Exhibit 2 before?
17 A. I can't remember.
18 Q. Have you seen certain police reports
19 arising from telephone calls that were made to
20 Ms. Walsh in January of 2009?
21 A. I'm sure I have, but I don't remember them.
22 Q. You don't remember whether you've ever seen
23 this particular police report?
24 A. I don't remember.

**Page 32**

1 Q. If you look to the second page of this
2 document, please; and if you can just read that
3 paragraph to yourself, please -- actually, the
4 second and third paragraphs on that page -- and just
5 let me know when you're done.
6         (Pause)
7 A. Okay.
8 Q. You've had a chance to review the second
9 and third paragraphs on Page 2 of Exhibit 2?
10 A. I have.
11 Q. Do you see that these paragraphs reference
12 certain telephone calls that were reported to have
13 been made to Ms. Walsh on January 28 of 2009?
14 A. Yes.
15 Q. Did you make these calls?
16 A. I did.
17 Q. Where were you when you made these calls?
18 A. I don't remember.
19 Q. Were you in your house?
20 A. I don't remember.
21 Q. Was your husband with you?
22 A. I don't remember.
23 Q. Why did you make these calls to Ms. Walsh?
24 A. I'd like to plead the Fifth.

**Page 33**

1 Q. You've already told me you've made the
2 calls. Are you going to plead the Fifth as to why
3 you made the calls?
4         MR. CARP: Objection.
5         MR. CALANDRELLI: I'm asking for
6 clarification.
7 A. I would like to plead the Fifth.
8 Q. How was it that you came to know
9 Ms. Walsh's telephone number?
10 A. I don't remember.
11 Q. Did Mr. Luciano provide you with the
12 telephone number?
13 A. I don't remember.
14 Q. *How did you decide that it was going to be
15 Ms. Walsh who received these calls, as opposed to
16 anybody else?
17 A. Would you mind if I took a moment to go to
18 the bathroom?
19 Q. I'd ask that you answer this question, and
20 then we can take a break.
21 A. Okay; could you repeat the question?
22 Q. Sure.
23         MR. CALANDRELLI: Could you read back
24 the question, please?

**Page 34**

1  (*Question read)
2  A. I don't remember.
3  Q. If you would like to take a break?
4  A. I would, yes, please.
5  (Recess)
6  Q. Are you all set?
7  A. Thank you.
8  Q. What telephone did you use to make these
9  calls to Ms. Walsh?
10  A. I don't remember.
11  Q. Did you use any service to assist you in
12  making these telephone calls?
13  MR. CARP: Objection.
14  A. SpoofCard. It's obvious.
15  Q. So you used the SpoofCard?
16  A. Yes.
17  Q. Did you own a SpoofCard at that point?
18  A. I'm not sure. I don't remember.
19  Q. How did you first come to learn of the
20  SpoofCard product?
21  A. I can't remember exactly. I know I was
22  with a bunch of people, either at a bar or a party
23  situation.
24  Q. Do you remember anybody whom you were with

**Page 35**

1  that mentioned the SpoofCard to you?
2  A. Not in particular, no.
3  Q. And what was said to you about what the
4  SpoofCard product is?
5  A. It wasn't said directly to me; it was like
6  at a party. People were showing it around and
7  thought it was interesting.
8  Q. And to the best of your memory, what did
9  you hear that was said about the product wherever
10  you were when you first learned of it?
11  A. All you have to go is go onto spoofcard.com
12  and you can change your phone number, change your
13  caller ID.
14  Q. Do you recall hearing anything else?
15  A. Not really. I don't recall.
16  Q. When you said people were showing it
17  around, what do you mean?
18  A. Like calling each other using it.
19  Q. And you were at some sort of social
20  gathering when you saw this?
21  A. Yeah. I can't remember exactly, but yeah.
22  Q. And this was the first time you had heard
23  of SpoofCard?
24  A. As far as I know, yes.

**Page 36**

1  Q. Prior to that time, you had never seen any
2  advertisements for SpoofCard?
3  A. No.
4  Q. You had never seen any promotional
5  materials for SpoofCard?
6  A. No.
7  Q. Do you recall when it was that you were at
8  this gathering when you learned of SpoofCard?
9  A. I don't recall.
10  Q. Do you know if it was close in time to
11  January 28, 2009?
12  A. I believe it was, but I can't exactly
13  remember.
14  Q. To your knowledge, did your husband know of
15  SpoofCard prior to you first hearing about it at the
16  social gathering?
17  A. I do not think so.
18  Q. Did you inform your husband of the
19  SpoofCard product after you learned of it?
20  A. I believe I did.
21  Q. Do you recall what you informed him about
22  it?
23  A. I don't recall exactly what I said.
24  Q. Do you recall whether you or he

**Page 37**

1  subsequently purchased SpoofCard minutes?
2  A. I don't recall.
3  Q. Do you recall ever accessing the SpoofCard
4  website in order to purchase minutes for SpoofCard?
5  A. I don't remember exactly; exactly.
6  Q. And if I understand this police report
7  correctly, you used the SpoofCard in order to make
8  the calls you made to Ms. Walsh appear as if they
9  were coming from a telephone number owned by the
10  Lucianos; is that correct?
11  A. That's what it says here, yes.
12  Q. Is that what happened?
13  A. I don't recall. I don't remember.
14  Q. Did you have any conversation with your
15  husband about making these calls before you made
16  them?
17  A. Before I made them?
18  Q. Correct.
19  A. No. But I don't remember.
20  Q. How did you decide to make the calls appear
21  as if they were coming from the Lucianos?
22  MR. CARP: Objection.
23  A. Can you repeat the question? I don't
24  understand if I understand it exactly.

Page 38

Q. Sure. The reason you used the SpoofCard was to make those calls to Ms. Walsh appear as if they were coming from someone else; correct?

A. I guess, yeah.

Q. You don't have to agree with me; I'm just asking for your knowledge.

A. I don't remember.

Q. All right. Were you upset with Mr. Luciano in January of 2009?

A. I was scared of him.

Q. And this was because of the advances that he had made on you?

A. Yes.

Q. And because of --

A. And coming by my house, yes.

Q. Any other reasons you were scared of him at this time?

A. I thought that he had a drug problem, and that was just another reason I was scared.

Q. What made you think he had a drug problem?

A. When I worked with him, I knew that he would do drugs at work; and he had offered drugs to me at work.

Q. What types of drugs did you witness

Page 39

Mr. Luciano using?

A. Snorting cocaine.

Q. Is that the same drug that he offered to you?

A. Yes.

Q. Any other reasons you thought Mr. Luciano had a drug problem?

   MR. CARP: Objection.

A. It's just my opinion. So no, I don't know.

Q. Did you intend to scare Ms. Walsh when you made the calls on January 28?

A. I don't remember.

Q. Did you intend to harass her?

A. I don't remember.

Q. Had you ever heard the name TelTech Systems prior to January 28 of 2009?

A. No.

Q. Did anybody associated with the SpoofCard product ever encourage or otherwise suggest to you that you should make these calls to Ms. Walsh?

A. No.

Q. Did anybody from or associated with the SpoofCard product ever suggest or otherwise encourage you to use the card to harass anybody?

Page 40

A. No.

Q. Did anybody associated with the SpoofCard product ever encourage or otherwise suggest to you that you should use the SpoofCard for a criminal purpose?

A. I don't think so.

Q. Did you at any time ever see any advertisements or other promotional materials associated with the SpoofCard product that suggested or otherwise encouraged you to use the SpoofCard product to harass somebody?

A. No, I've never seen that.

Q. Did you ever at any time see any advertisements or other promotional materials associated with the SpoofCard product that suggested or otherwise encouraged you to use the SpoofCard for a criminal purpose?

A. No.

Q. Prior to and including January 28, 2009, do you recall any instances where you personally accessed the SpoofCard website?

A. I don't remember.

Q. So then, is it fair to say that you don't recall any content that appeared on the SpoofCard

Page 41

website?

A. That is fair to say, yes.

Q. And it's also fair to say that you don't recall any content that was not on the SpoofCard website?

A. That is fair to say, yes.

Q. Did you know at the time that you made these calls on January 28 that Mr. Luciano had a criminal record?

A. Yes.

Q. Did you know that he had outstanding warrants?

A. No, I did not.

Q. Did you intend for Mr. Luciano to be arrested as a result of these calls?

A. No, I did not.

Q. If you look at Exhibit 2, the second paragraph that you've already read --

A. Yes.

Q. -- if you look about two-thirds of the way down that paragraph, do you see a sentence that says, "When Walsh asked Luciano what he wanted, he stated the following, 'Meet me in the laundry room. I can't wait to fuck you up the ass so hard. I know

**Page 42**

1  what you like.'" Do you see that?
2      A. Yes.
3      Q. Did you make that statement on the
4  telephone?
5          MR. CARP: Objection.
6      A. I don't remember.
7      Q. What caused you to make that statement?
8          MR. CARP: Objection.
9      A. I really don't remember.
10     Q. Did anybody associated with the SpoofCard
11 product ever suggest or otherwise encourage you to
12 make a statement such as that to Ms. Walsh?
13     A. No.
14     Q. Or to anybody else?
15     A. No.
16     Q. I'm placing now what's been marked
17 previously as Exhibit 3 to Mr. DiLorenzo's
18 deposition. I'd just ask you to take a minute to
19 review that, if you will, please.
20         (Pause)
21     A. Okay.
22     Q. If you look at the second page of this
23 exhibit, do you see the first full paragraph, that
24 begins "On February 2 of 2000"?

**Page 43**

1      A. Yes.
2      Q. Can you just take a minute to review that
3  paragraph to yourself, and let me know when you're
4  finished?
5          (Pause)
6      A. Okay.
7      Q. Do you see this paragraph references a
8  series of voicemails that Ms. Walsh reported to the
9  police that she received on February 2 of 2009?
10     A. Yes, I see that.
11     Q. Did you make any of these calls on February
12 2, 2009 to Ms. Walsh?
13         MR. CARP: Objection.
14     A. I don't think so. I don't remember,
15 though.
16     Q. Do you know if your husband made these
17 calls?
18     A. I don't know.
19     Q. Did you ever ask him whether he made those
20 calls?
21     A. No.
22     Q. So if you don't recall making these calls,
23 is it fair to say you don't recall using a SpoofCard
24 to make any calls to Ms. Walsh on February 2 of

**Page 44**

1  2009?
2      A. That is correct.
3      Q. It's also fair to say that you don't have
4  any knowledge of your husband using a SpoofCard --
5          MR. CARP: Objection.
6      Q. -- to make telephone calls to Ms. Walsh on
7  February 2, 2009; is that correct?
8      A. That is correct.
9      Q. Have you had occasion to speak with
10 Mr. Luciano at any time after you quit your job at
11 the restaurant?
12     A. I don't remember.
13     Q. You don't have any memory of speaking with
14 him after that time?
15     A. Like forevermore after?
16     Q. Well, at some point before January 28,
17 2009, you stopped working at the restaurant;
18 correct?
19     A. Correct.
20     Q. Because Mr. Luciano made you feel
21 uncomfortable?
22     A. Yes.
23     Q. Any time since that date, have you spoken
24 with Mr. Luciano?

**Page 45**

1      A. Yes.
2      Q. When?
3      A. When we were in court, in Quincy Court.
4  I should say, he spoke to me while we were in the
5  waiting room.
6      Q. This is when you were in Quincy District
7  Court?
8      A. Yes.
9      Q. Was this in connection with criminal
10 charges that had been asserted against your husband?
11     A. Correct, yes.
12     Q. And what did Mr. Luciano say to you?
13     A. I don't remember exactly what he said. He
14 talked nonstop.
15     Q. Was this directed at you, or was it
16 directed at someone in addition to you?
17     A. Myself and my husband.
18     Q. Do you recall anything that he said?
19     A. Yes. I recall one thing. He called me a
20 pig.
21     Q. Do you recall anything else?
22     A. Not really. I could not quote him, no.
23     Q. Did you say anything to him during this
24 time at the courthouse?

**Page 54**

1  one more time?
2  Q. Sure. You agree with me that what I've
3  read is what the report reflects you said --
4  A. Yes.
5  Q. -- but you say you don't have a memory of
6  actually saying that; correct?
7  A. Correct.
8  Q. So all I'm asking you is, do you have any
9  reason to believe that you didn't actually say this
10 to Detective Willard?
11 A. No, there's no reason; no, I guess not.
12 Q. You just don't recall doing it?
13 A. I don't.
14 Q. The next sentence says, "Johnienne also
15 said that the calls were not meant to threaten or
16 intimidate Siobhan in the case against Luciano." Do
17 you see that?
18 A. Yes, I see it.
19 Q. Did you inform Detective Willard of that?
20 A. That's what it says I said.
21 Q. You don't recall?
22 A. I don't.
23 Q. Do you have any reason to believe that you
24 didn't say that?

**Page 55**

1  A. No.
2  Q. The next sentence says "Johnienne said she
3  wouldn't try to help Luciano in that way." Do you
4  recall telling that to Detective Willard?
5  A. I don't.
6  Q. Do you have any reason to believe that you
7  didn't say that?
8  A. No.
9  Q. If you look at Paragraph 9, beginning in
10 the second sentence, it says "Johnienne said Siobhan
11 involved herself by helping John Luciano to harass
12 them. Johnienne said she believes Siobhan has
13 driven John Luciano to their house a number of
14 times. Johnienne said her neighbors have reported
15 seeing a woman in car outside of their house that
16 she believes was Siobhan."
17         That refers to the incidents you've
18 already told me about today; correct?
19 A. Yes.
20 Q. Do you recall informing Detective Willard
21 of those incidents?
22 A. I do not recall this.
23 Q. The next sentence says "Johnienne said John
24 and Siobhan have a relationship of some kind, but

**Page 56**

1  she didn't know how far it went."
2         Did you believe that John Luciano and
3  Siobhan Walsh had some sort of relationship in 2009?
4  MR. CARP: Objection.
5  A. I don't know what I believed then. I don't
6  remember.
7  Q. Do you have any reason to believe that you
8  didn't say this to Detective Willard?
9  A. No.
10 Q. Do you have any knowledge of John Luciano
11 using a SpoofCard to make any telephone calls to you
12 or your husband?
13 MR. CARP: Objection.
14 A. I'm sorry?
15 Q. Do you have any knowledge of John Luciano
16 using a SpoofCard to make any telephone calls to you
17 or your husband?
18 A. I don't know.
19 Q. Were you aware that Mr. Luciano was
20 arrested as a result of the telephone calls that you
21 made to Ms. Walsh?
22 A. I now know that happened, yes.
23 Q. How did you find out that that had
24 happened?

**Page 57**

1  A. I don't remember exactly.
2  Q. When did you find out that that had
3  happened?
4  A. Most likely when we got in trouble for it,
5  when we had to go to court for it; but I don't
6  remember exactly when.
7  Q. I asked you about advertisements concerning
8  the SpoofCard product before.
9  A. Yes.
10 Q. Have you ever read any customer
11 testimonials associated with the SpoofCard product?
12 A. I don't think so.
13 Q. Have you ever seen any?
14 A. I don't remember.
15 Q. Have you personally paid any money to
16 Ms. Walsh as a result of these telephone calls?
17 A. Yes, I believe so.
18 Q. How much have you paid?
19 A. That, I don't know off the top of my head.
20 Q. Was this money that you actually paid, or
21 someone paid on your behalf?
22 A. Someone paid on my behalf.
23 Q. Are you referring to a payment made by
24 Mr. DiLorenzo's parents?

Page 66

1  you learn about the existence of the website?
2      A. Yes.
3      Q. And I believe that you answered this
4  question, but let me just be thorough here. Do you
5  recall anyone who you talked to at that gathering
6  about the SpoofCard; the identity of that person?
7      A. No, I don't.
8      Q. Do you know if during the course of that
9  gathering you heard any stories in regards to how
10 any of the guests had utilized the SpoofCard
11 previously?
12     A. No.
13     Q. Did you get an understanding from that
14 gathering of how the SpoofCard could be used?
15     A. I mean, it seems pretty simple to me.
16     Q. What you learned at that gathering is that
17 you could place a call and masquerade as someone
18 else by using their personal identifying phone
19 number; isn't that right?
20         MR. CARP: Objection to the question as
21 phrased.
22         MR. CALANDRELLI: Objection.
23     Q. You can go ahead and answer.
24     A. Yes.

Page 67

1      Q. And you can do that without the permission
2  of the person who the phone number belongs to; is
3  that right?
4      A. I believe so, yes.
5      Q. And that was the whole idea, to be able to
6  place a call, pretend to be someone else, and have
7  the person who's answering the call think you're
8  someone else; is that right?
9          MR. CARP: Objection.
10         MR. CALANDRELLI: Objection.
11     A. The way it was presented to me at the
12 party, gathering, whatever, was it was funny. The
13 people thought it was funny; they were laughing.
14     Q. And do you recall specifically any stories
15 they told you that were making them laugh? Did they
16 tell you how they used the card?
17     A. No.
18     Q. Do you recall the season of the year that
19 that party took place in?
20     A. I don't.
21     Q. Do you recall the location of the party?
22     A. No.
23     Q. Do you recall whether it was in a private
24 residence, or a public house of some kind?

Page 68

1      A. I don't recall.
2      Q. Was your husband likewise present at this
3  party?
4      A. I don't believe so.
5      Q. What caused you to purchase a SpoofCard, do
6  you recall?
7      A. I don't recall.
8      Q. Did you purchase a SpoofCard prior to your
9  dispute with Mr. Luciano that you've testified to?
10     A. Prior to the dispute?
11     Q. Well, at a certain juncture you became
12 angry with Mr. Luciano; correct?
13     A. I became scared.
14     Q. Prior to becoming scared of Mr. Luciano,
15 did you purchase a SpoofCard?
16     A. Yes. I hadn't had it for very long at all.
17     Q. When did you become scared of Mr. Luciano?
18 Was there a particular event?
19     A. No.
20     Q. Was it sometime in January of the year 2009
21 that you became scared of Mr. Luciano?
22     A. It was while I worked with him.
23     Q. And when did you terminate your employment
24 at the restaurant?

Page 69

1      A. I can't remember exactly.
2      Q. Was it sometime in January of year 2009?
3      A. I can't remember.
4      Q. Were you still employed at the restaurant
5  when you placed the call to Ms. Walsh on January 28,
6  year 2009?
7          MR. CARP: Objection.
8      A. I don't think so, no.
9      Q. Do you recall being employed at the
10 restaurant at any point during year 2009?
11     A. I don't recall.
12     Q. Do you recall purchasing a SpoofCard at any
13 time during year 2008?
14     A. I don't remember.
15     Q. I'm going to show you a document that's
16 been previously marked as Exhibit 7 and specifically
17 refer your attention to the first page of this
18 document. At the top of the page, right next to the
19 words "Call Logs," there's a number. Do you see
20 that?
21     A. Yes.
22     Q. 700181415?
23     A. Yes.
24     Q. I'll represent to you that this document